## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 18-CR-103 (02) (EGS)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **TONY JOHN EVANS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

As part of an outrageous extortion scheme motivated by pure greed, Defendant Tony John Evans ("the Defendant") impersonated a mobster while asking Daniel Zancan, "Do I need to tell you where your kids go to school? Do I need to tell you where you live?" The psychological turmoil that the Defendant and his co-conspirators unleashed on Zancan caused Zancan to embezzle more than $4.2 million from his employer, a small business in the District of Columbia. For the Defendant's role in the scheme, the United States recommends that the Court sentence him to 66 months' incarceration followed by three years of supervised release, an order of restitution in the amount of $4,217,542.86, and a forfeiture money judgment in the amount of $3,229,010.

### BACKGROUND

On September 19, 2018, the Defendant pled guilty to participating in a manipulative and sinister extortion, fraud, and money laundering scheme that was perpetrated by him, Hollie Nadel ("Nadel"), and co-defendant members of his family (brothers Robert Evans and Corry Evans, parents Archie Kaslov and Candy Evans, and then-common-law sister-in-law Gina Russell ("Russell")). The scheme resulted in Daniel Zancan embezzling more than $4.2 million from his D.C. employer, R&R Mechanical Contractors, Inc., and its subsidiary 2902 Bladensburg Road LLC. The Defendant played an integral role in the scheme by pretending to be a mob boss/loan shark in order to create fear in Zancan's mind. The Defendant magnified this fear by directly

threatening harm to Zancan and his family, including his children, if money, and later gold bars, were not delivered to designated locations in New York.   The Defendant also played an important role in converting, laundering, and disbursing the large cash drops and gold which Zancan delivered.   Perhaps the most shameless aspect of the Defendant's conduct is that he and his co-defendant family members used the millions of dollars in extorted cash and gold bars on brazen spending sprees to purchase expensive watches, jewelry, luxury merchandise, vacations, and high-end automobiles.   His criminal conduct and behavior subsequent to that conduct warrants a 66-month sentence.

### FACTUAL AND PROCEDURAL HISTORY

**I.      The Scheme to Extort Daniel Zancan and to Defraud R&R Mechanical Contractors, Inc.**

Nadel advertised "sensual" massage services on Backpage.com and provided those services in Maryland and the District of Columbia. More importantly, Nadel used Backpage as a means by which to identify, con, and extort her clients out of money, jewelry, expensive merchandise, and other precious items for the use and enjoyment of the Defendant and his co-defendant family members.   Nadel met Zancan and numerous other men on Backpage before beginning romantic relationships with each of them and spinning tales of distress, physical danger, and financial woe in order for these "marks" to provide money and valuables to her, which she then provided to the Defendant and his co-defendants.   *See also* Evans Statement of Offense ¶ 14(a) (ECF No. 74).

During the course of her relationship with Zancan, Nadel told him that her father had abused her during her youth and attacked her when she confronted him about the abuse years later. She also said that her father initiated legal proceedings against her and that she had become

indebted to unidentified "dangerous" people (i.e., the Defendant and his co-defendants) in New York when paying for legal costs associated with the dispute with her father.   She said her friend of many years, Russell, provided her with financial assistance.   She also claimed the dangerous people to whom she owed money held her against her will in New York, sometimes for days at a time, and physically assaulted her.   She convinced Zancan that these dangerous people posed a grave danger to her.

Zancan tried to help Nadel pay off her alleged debt to the New York individuals.   When Nadel asked Zancan for money to assist in her dispute with her estranged father, he initially provided her about $2,000 or $2,500.   He subsequently learned through her that the dangerous people in New York demanded ever-greater sums of money to ensure Nadel's safety.   Nadel told Zancan her life was in danger if she did not make the payments.

Sometime in the beginning of January 2017, per Russell's instructions, Nadel told Zancan that the New York individuals demanded that she pay $100,000.   *See also* Evans Statement of Offense ¶ 14(b) (ECF No. 74).   Because Nadel could not make such a payment, she said the New York individuals requested that she pay by providing them two expensive Rolex watches instead. Nadel asked Zancan to help finance the watches, so they traveled to a high-end jewelry store in Northern Virginia together.   During their trip, Zancan observed Nadel communicating with the individuals in New York via text message and telephone call.   Zancan could not hear the contents of the conversation, but Nadel relayed them to him.   Zancan believed Nadel was really being threatened, so he filled out a credit application with the jewelry store and obtained a $10,000 line of credit.   Because he only obtained $10,000 in credit, however, he was unable to purchase any watches to assist Nadel with her "payment."

While they were outside the jewelry store, Zancan told Nadel that he could use his employer's funds to make a cash payment to the New York individuals. Nadel claimed that she initially did not want to take the risk of Zancan misappropriating company funds, but ultimately agreed with Zancan's plan out of fear for her safety.   Nadel told the New York individuals, via telephone, that she could not get their payment in cash form and she said they suggested obtaining a cashier's check in her name, cashing the check, and providing them with cash.

On January 11, 2017, and continuing unabated through March 27, 2017, Zancan began embezzling funds from his employer to help Nadel. On that date, he initiated an approximate $110,000 wire transfer from one of his employer's bank accounts to Nadel's personal Bank of America account. Two days later, with the assistance of the Defendant and his co-defendant brothers Robert Evans and Corry Evans, Nadel cashed a $110,000 Bank of America cashier's check at a check-cashing store in New York.   *See* Evans Statement of Offense ¶ 14(c) (ECF No. 74).   The Defendant went to the check cashing store with Nadel, and she provided the proceeds of the check to the Defendant for distribution to his co-defendants.   *See* Evans Statement of Offense ¶ 14(d) (ECF No. 74).

After the initial payment, which Zancan believed Nadel delivered in cash to the "dangerous" people in New York (i.e., the Defendant and his co-defendants), Nadel indicated that the "dangerous" people continued to demand more money.   Thus, Zancan embezzled more funds from his employer to make payments to these people on Nadel's behalf.[1]   It is here where the

---

[1] As the Defendant acknowledged in the Statement of Offense, the Defendant together with his co-defendants, as well as with Nadel and Zancan, obtained a total of $4,217,542.86 in monies, funds, credits, and assets owned by and under the custody and control of SunTrust Bank and BB&T Bank, including $3,818,512.86 in monies, funds, credits, and assets of R&R Mechanical Contractors, Inc. and $399,030.00 in monies, funds, credits, and assets of 2902 Bladensburg Road

Defendant and his co-defendants went to truly depraved lengths.

For example, on January 20, 2017, Russell demanded $500,000 from Nadel, and recruited and enlisted the Defendant to assist with this demand.   *See* Evans Statement of Offense ¶ 14(k) (ECF No. 74).   Nadel and Russell discussed the Defendant posing as a mob boss or loan shark if payments were not made to the Defendant and his co-conspirator/co-defendant family members. *Id.*   That evening, Zancan was driving home from work when he received a telephone call from Nadel, who indicated that "Tony" (i.e., the Defendant) wanted to speak with him.   The Defendant was on the line as part of a three-way conversation with Nadel and Zancan.   The Defendant said Nadel would not be allowed to leave New York until a $500,000 payment was made.   The Defendant also told Zancan that he knew where Zancan lived and worked, and where his child went to school.   *See* Evans Statement of Offense ¶ 14(l) (ECF No. 74).   Not surprisingly, Zancan was terrified and feared for his safety and the safety of his family.

On January 27, 2017, Nadel changed the departure date of the Defendant's flight from New York to Los Angeles to enable the Defendant to remain in New York on January 27, 2017, to be available for the continued extortion of Zancan and to take possession of the $500,000 once it was delivered.   *See* Evans Statement of Offense ¶ 14(p) (ECF No. 74).   Also on that date, Zancan drove from the Washington, D.C. metropolitan area to New York to make the demanded payment and to retrieve Nadel.   The Defendant directed Zancan to a specific location in New York.   After Zancan stopped at that location, one of the Defendant's co-defendants photographed the back of Zancan's vehicle and texted it to Nadel to show to Zancan to create the illusion and impression

---

LLC.   *See* Evans Statement of Offense ¶ 28 (ECF No. 74).   As the Defendant further acknowledged in his Statement of Offense, he handled or otherwise received $3,229,010 of this amount.   *See id.* ¶¶ 14(d), (n), (u), (ff), (kk), (nn), (ss), and (tt) (totaling $3,229,010).

that Zancan was being surveilled and followed.   *See* Evans Statement of Offense ¶¶ 14(s-t) (ECF No. 74).   The Defendant then directed Zancan to a Fairfield Inn where Nadel had reserved a room and instructed Zancan to deliver the $500,000 in cash.   The Defendant retrieved a backpack containing the cash from that location and delivered it to his co-conspirator/co-defendant family members.   *See* Evans Statement of Offense ¶ 14(u) (ECF No. 74).[2]

The demands for money from Zancan by Nadel and Russell continued.   In February 2017, Russell instructed Nadel to demand $1.9 million from Zancan.   *Id.* ¶ 14(dd).   These continuing and growing demands were built on the foundation of Zancan's psychological turmoil and emotional terror, which the Defendant established through interactions with Zancan.   The reality of Zancan's fear is captured in the following text messages between Russell (in yellow) and Nadel (in white) when they were discussing the scheme.

| Timestamp | From | To | Body |
|---|---|---|---|
| 05/02/2017 08:16:15 (GMT) | ████4478 | ████6684 | Is everything OK |
| 05/02/2017 08:16:22 (GMT) | ████6684 | | No it's not |
| 05/02/2017 08:16:38 (GMT) | ████4478 | ████6684 | What's going on don't let him make any phone calls |
| 05/02/2017 08:16:45 (GMT) | ████6684 | | It's pushing it too far |
| 05/02/2017 08:16:56 (GMT) | ████6684 | | He's freaking out about calling Tony |

---

[2] During a March 15, 2018 meeting with the FBI (with his counsel present), the Defendant remarked that the $500,000 in the backpack was "average shit" for him.

| 05/02/2017 08:16:59 (GMT) | 6684 | | At this hour |
|---|---|---|---|
| 05/02/2017 08:17:00 (GMT) | 4478 | 6684 | OK so what do you want to do |
| 05/02/2017 08:17:10 (GMT) | 6684 | | I don't know - trying to calm him down |
| 05/02/2017 08:17:15 (GMT) | 4478 | 6684 | Tell him to calm down and not to freak out and to get it together |
| 05/02/2017 08:17:21 (GMT) | 6684 | | He's sobbing |
| 05/02/2017 08:17:36 (GMT) | 4478 | 6684 | Tell him not to cry tell him that you love him very much Tom everything is going to be OK |
| 05/02/2017 08:17:55 (GMT) | 4478 | 6684 | Don't worry I have conference he's going to give it to you |
| 05/02/2017 08:18:23 (GMT) | 6684 | | Telling him |

| 05/02/2017 08:18:23 (GMT) | 4478 | 6684 | Tell him that he would rather deal with Tony Tony is more sensible thing to deal with these crazy nut jobs their animals at least Tony is a more sensible person tell him not to be afraid |
|---|---|---|---|
| 05/02/2017 08:18:40 (GMT) | 6684 | | I did but he's afraid of pissing Tony off |
| 05/02/2017 08:18:53 (GMT) | 6684 | | Calling him 3am before the super bowl |
| 05/02/2017 08:19:04 (GMT) | 4478 | 6684 | Tell him not to be worried about pissing Tony off time to be worried about losing you because he's going to lose you forever |
| 05/02/2017 08:19:10 (GMT) | 6684 | | Ok |

| Time | | | Message |
|---|---|---|---|
| 05/02/2017 08:20:28 (GMT) | 4478 | 6684 | Tell him you feel safer with Tony |
| 05/02/2017 08:20:37 (GMT) | 6684 | | He knows that |
| 05/02/2017 08:21:32 (GMT) | 4478 | 6684 | He's going to do it don't worry |
| 05/02/2017 08:23:18 (GMT) | 4478 | 6684 | Tell me you're in danger in that you have no choice |

| Time | | | Message |
|---|---|---|---|
| 05/02/2017 08:23:40 (GMT) | 6684 | | I know |
| 05/02/2017 08:23:52 (GMT) | 4478 | 6684 | What is he saying |
| 05/02/2017 08:23:54 (GMT) | 6684 | | Just trying to get him here |
| 05/02/2017 08:24:03 (GMT) | 6684 | | Faster |
| 05/02/2017 08:24:17 (GMT) | 4478 | 6684 | Do you just want to make a three-way line |

| Time | | | Message |
|---|---|---|---|
| 05/02/2017 08:25:08 (GMT) | 4478 | 6684 | Tony only have five minutes you have to hurry |
| 05/02/2017 08:25:27 (GMT) | 4478 | 6684 | Tell him that they said they're coming back to get you you don't know when it's going to be your scared |
| 05/02/2017 08:56:42 (GMT) | 6684 | | You there? |
| 05/02/2017 09:35:07 (GMT) | 4478 | 6684 | Tell him that Tony's guy told you that the boss is going to talk to him on Monday |

8

| 05/02/2017 09:35:18 (GMT) | ████6684 | | Ok |
|---|---|---|---|
| 05/02/2017 09:35:28 (GMT) | ████4478 | ███6684 | That they will not disrupt this weekend because this is their biggest weekend of business |
| 05/02/2017 09:35:45 (GMT) | ████6684 | | Ok |
| 05/02/2017 09:36:57 (GMT) | ████4478 | ███6684 | Tell me what he is saying |

| 05/02/2017 09:37:43 (GMT) | ████6684 | | He's concerned about Thur and coming up with it so fast |
|---|---|---|---|
| 05/02/2017 09:38:01 (GMT) | ████4478 | ███6684 | Help him |
| 05/02/2017 09:38:07 (GMT) | ████6684 | | I will |

Building upon the fear and torment that the Defendant instigated and perpetuated, on February 17, 2017, Nadel sent a text message to Zancan that "Tony" (i.e., the Defendant) was ready to talk.   The Defendant, Nadel, and Zancan communicated by three-way cellular telephone call during which the Defendant informed Zancan that the "juice" on the $1.9 million was 10 percent per month, meaning that Nadel owed 10 percent monthly interest on a $1.9 million debt to the individuals who purportedly threatened harm (i.e., the Defendant and his co-defendants) unless the debt was repaid.   As part of the extortion scheme, the Defendant, Russell, and Nadel created fictional individuals named "Sammie" and "Santino" who allegedly were beating, threatening rape, and holding Nadel hostage to terrify and intimidate Zancan further into paying.   The Defendant agreed to accept approximately $1.6 million in gold bars from Zancan.   *See* Evans Statement of Offense ¶ 14(hh) (ECF No. 74).

9

On March 23, 2017, Zancan delivered the gold bars by dropping off luggage containing the gold bars at a hotel in New York, where the Defendant retrieved the gold bars and delivered them to his co-defendants.   The Defendant and his co-defendants sold several of the gold bars to a gold dealer in New York in exchange for cash.   *See* Evans Statement of Offense ¶ 14(ss) (ECF No. 74).

Using funds obtained through the extortion and fraud scheme, the Defendant and his co-defendants purchased jewelry, watches, and gold coins.   *See* Evans Statement of Offense ¶¶ 14(o, mm, oo, uu) (ECF No. 74).   Additionally, on April 17, 2017, the Defendant wired $195,000, including $126,000 in proceeds of this criminal activity, from his account at Santander Bank to Rolls Royce Motor Cars of Orange County for the purchase of a 2009 Rolls Royce Phantom.   *Id.* ¶ 14(vv).

## II.    The Execution of Search Warrants in New York

On October 25, 2017, the FBI executed several search warrants in the Southern District of New York at locations associated with the Defendant and his co-defendants.   During the search of the Defendant's residence on Third Avenue in New York, New York, law enforcement seized, among other things, criminal proceeds consisting of $20,000 and a ring with a clear stone.   *Id.* ¶ 24.   The Defendant gave a voluntary interview to the FBI at the time of the search.   The Defendant advised the FBI that he kept a double-barrel shotgun in his apartment, which he located and surrendered to law enforcement.[3]   At the end of the interview, the Defendant further stated,

---

[3] The Defendant purchased the weapon, a 12-gauge shotgun, in California in 2016 based on a receipt located in the residence (purchase receipt attached hereto as Exhibit A).   The shotgun was not registered as required under New York City law. The government is not alleging and does not believe that the firearm was used in conjunction with the extortion, fraud, and money laundering scheme.

"Let me tell you something about myself.   I'm a scam artist.   I'm a cheap skate car salesman" who attempts to "trick" people into paying for bodywork on their car.

Following the search of the Defendant's residence and his interview by the FBI, the Defendant curiously but not coincidentally went to Santander Bank, located at 250 Lexington Avenue, New York, New York, where he had a safe deposit box.   Law enforcement was waiting at that location to execute a search warrant on the safe deposit box.   The Defendant wanted to get access to the contents of the box to "take pictures" claiming, "Please, my entire life savings is in that box.   Everything in there has come off someone who has died in the family."[4]   During the search of the safe deposit box, law enforcement seized the following: (1) 25 yellow-colored coins; (2) a one-kilogram yellow-colored bar; (3) one diamond-like ring in a Cartier box; (4) two diamond-like bracelets in a Tiffany box; (5) three diamond-like bracelets in a Tiffany box; (6) four Patek Philippe watches; (7) two diamond-like necklaces; (8) two Audemars Piguet watches (one silver color and one gold color); (9) eight Rolex watches (three yellow-colored, two metal-colored, two rose-yellow-colored, one mix yellow/metal colored); (10) one broken Rolex watch (metal colored); (11) three Corum watches; (12) three Cartier watches; (13) one Rolls Royce watch; (14) four diamond-like rings in a Tiffany bag (three yellow-colored, one metal-colored); (15) two diamond-like earrings in a Tiffany bag; (16) two diamond-like earrings in a Tiffany bag; (17) one yellow-colored earring and one yellow-colored ring in brown box; (18) one diamond-like pin; (19) one yellow-colored coin necklace; (20) one long diamond-like necklace; (21) one yellow-colored Movado watch; and (22) one yellow-colored long necklace.   *Id.* ¶¶ 25-26.[5]

---

[4] Later that afternoon, the Defendant contacted one of the FBI agents by telephone to reiterate his claim that the jewelry that was in the safe deposit box was from family heirlooms.

[5] On November 26, 2017, the Defendant surrendered to law enforcement two additional

Law enforcement also executed a search warrant at the residence of Defendants Archie Kaslov and Candy Evans on East 33rd Street in New York, New York.   During the search, law enforcement recovered a Smith & Wesson .357 revolver from underneath the mattress in a bedroom, and 35 rounds of .357 ammunition from a dresser and shelf in that same room.[6]

### III.      The Indictment

On April 19, 2018, a federal grand jury in the District of Columbia returned a thirteen-count indictment against the Defendant, Russell, Robert Evans, Corry Blue Evans, Kaslov, and Candy Evans.   ECF No. 1.   The Defendant was charged in Counts One (Conspiracy to Commit Extortion, Bank Fraud, and Wire Fraud, in violation of 18 U.S.C. § 371), Two (Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a)), Five (Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h)), and Nine (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957)).   *Id.*

### IV.      The Defendant's Guilty Plea to Extortion vs. Money Laundering Conspiracy

On September 19, 2018, the Defendant pled guilty to Count Two of the Indictment – Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a) – pursuant to a plea agreement with the Government.   *See* Evans Plea Agreement ¶ 1 (ECF No. 73).   Based

---

one-kilogram gold bars, which were additional criminal proceeds.   On July 26, 2018, the Defendant surrendered to law enforcement a Rolex watch, which was additional criminal proceeds. *See* Evans Statement of Offense ¶ 27 (ECF No. 74).

[6] The Defendant purchased the revolver in California in 2016 based on a receipt located in the residence (purchase receipt attached hereto as Exhibit A).   The revolver was not registered as required under New York law.   As with the other firearm mentioned above, the government is not alleging and does not believe that the firearm was used in connection with the extortion, fraud, and money laundering scheme.

on the agreed estimated U.S. Sentencing Guidelines ("U.S.S.G.") Offense Level, and factoring in the Defendant's acceptance of responsibility, the parties agreed on an Estimated Guidelines Range of 57-71 months' incarceration and an estimated fine range of between $20,000 and $200,000. *Id.* ¶ 4. The parties also agreed that restitution would not exceed $4,217,542.86, that the Defendant would be subject to a forfeiture money judgment, and that the Defendant would forfeit listed property and proceeds.  *Id.* ¶¶ 11-12; *see also* Evans Consent Order of Forfeiture (ECF No. 77).

Under the U.S. Sentencing Guidelines, if the Defendant had been convicted after trial of Conspiracy to Commit Money Laundering, as charged in Count 5 of the Indictment, he would have faced a recommended sentence of 135 to 168 months' incarceration based on an approximate $4.2 million loss amount.   If he had been required to plead guilty to that offense instead of Count Two, after receiving credit for acceptance of responsibility, his recommended guidelines sentence would have been 97 to 121 months' imprisonment, a range approximately 70 percent higher than the 57 to 71 month range within which he finds himself.

The Government's decision to afford the Defendant the ability to plead guilty to an offense where his sentencing range would be 57 to 71 months as opposed to one where he would face a recommended sentence of 97 to 121 months was deliberate.   In fashioning the plea offer, the Government consciously and deliberately considered the value of the information the Defendant provided (with counsel present) to law enforcement in November 2017, February 2018, March 2018, and July 2018.   The Government also considered the Defendant's voluntary surrender of additional gold bars and a luxury watch, which he had to retrieve from a pawn shop. The information that he provided, while valuable in part, also consisted of the Defendant: (1) significantly minimizing his involvement and the involvement of his co-defendant family

members (with the exception of Russell, i.e., his brother Robert's former common-law wife); (2) engaging in a pattern of deflection and progressive truth telling; and (3) grossly understating the amount of money he received.

After taking all of that information into account, the Government extended the Defendant a plea offer, which gave him considerable credit for (1) sitting down with the government on multiple occasions, (2) ensuring that some of the criminal proceeds were forfeited to the government for the ultimate benefit of the victim, and (3) providing additional—though certainly not all—details about the crimes that took place in 2017. In the end, the count to which the Defendant pled guilty and its corresponding significantly lower Guidelines range adequately accounts for his assistance with the investigation. He is not entitled to any further benefits or sympathy for inflicting the type of psychological torment that he did so that he and his family members could squander millions of dollars on jewelry, vacations, and luxury cars.

The government submits that a sentence of 66 months' incarceration followed by 3 years of supervised release, an order of restitution in the amount of $4,217,542.86, and a forfeiture money judgment in the amount of $3,229,010 is appropriate in this case.

## ARGUMENT

### I.    THIS COURT SHOULD ORDER $4,217,542.86 IN RESTITUTION

As set forth in the plea agreement between the parties, s*ee* Evans Plea Agreement ¶ 11 (ECF No. 73), the Mandatory Victims Restitution Act of 1996 ("MVRA"), as set forth in 18 U.S.C. § 3663A, governs restitution in this case.    Relevant here, it applies "in all sentencing proceedings for convictions of or plea agreements relating to charges for, any offense . . . that is . . . a crime of violence . . . [or] an offense against property under [Title 18], . . . including any offense committed

14

by fraud or deceit[,] . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss."   *Id.*   The MVRA requires that a sentencing court "shall order . . . that the defendant make restitution to the victim of the offense."   18 U.S.C. § 3663A(a)(1).   The term "victim" is defined as "a person directly and proximately harmed as a result of the commission of" an offense covered by Section 3663A "including, in the case of an offense that involves as an element a scheme [or] conspiracy, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme."   18 U.S.C. § 3663A(a)(2).

The MVRA provides that "in the case of an offense resulting in damage to or loss or destruction of property," the order of restitution "shall require" that the defendant "return the property" to its owner or, if such return is "impossible, impracticable, or inadequate, pay an amount equal to" the "value of the property" less "the value . . . of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1).   The MVRA additionally provides that, "in any case," the order of restitution shall require the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."   18 U.S.C. § 3663A(b)(4).

The sentencing court must "order restitution to each victim in the full amount of each victim's losses," and restitution must be determined "without consideration of the economic circumstances of the defendant."   18 U.S.C. § 3663A(f)(1)(A); 18 U.S.C. § 3663A(d) (a restitution order under Section 3663A "shall be issued and enforced in accordance with section

3664"). The statute places the burden of proof on the government, by "the preponderance of the evidence," to "demonstrat[e] the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3663A.

The Defendant acknowledged that he, together with his co-defendants, as well as Nadel and Zancan, obtained a total of $4,217,542.86 in monies, funds, credits, and assets owned by and under the custody and control of SunTrust Bank and BB&T Bank, including $3,818,512.86 in monies, funds, credits, and assets of R&R Mechanical Contractors, Inc. and $399,030.00 in monies, funds, credits, and assets of 2902 Bladensburg Road LLC. *See* Evans Statement of Offense ¶ 28 (ECF No. 74). The Defendant's sworn admission meets all the necessary requirements under the MVRA. Accordingly, this Court should order the Defendant to pay restitution in the amount of $4,217,542.86.

## II. THIS COURT SHOULD ORDER A FORFEITURE MONEY JUDGMENT IN THE AMOUNT OF $3,229,010

Pursuant to the Plea Agreement, *see* Evans Plea Agreement ¶ 12(c) (ECF No. 73), the Court is required to impose forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the offense" to which the Defendant pled guilty. *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c). Criminal forfeiture in this case includes both a money judgment and forfeiture of specific property traceable to the extortion scheme.[7] Money judgments are generally ordered where, as here, the actual proceeds of the defendant's offense of conviction cannot be found or are unavailable. *See* 21 U.S.C. § 853(p); Federal Rule of Criminal Procedure

---

[7] Pursuant to the Consent Order of Forfeiture, the Defendant has consented to the forfeiture of specified property. *See* Evans Consent Order of Forfeiture (ECF No. 77).

32.2(e); *United States v. Day*, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008).   The money judgment should be equal to the amount of proceeds the defendant derived from his scheme.

The majority rule, applied by courts in this District and elsewhere, holds that the forfeiture of criminal "proceeds" refers to the gross proceeds of the offense, rather than net profits.   *See, e.g.*, *United States v. Hoover-Hankerson*, 511 F.3d 164, 171 (D.C. Cir. 2007) (finding that the district court was not bound by jury's forfeiture verdict in computing loss for purposes of sentencing; "forfeiture is a means of forcing a criminal defendant to disgorge ill-gotten profits[,]" while loss focuses on pecuniary harm to the victim); *United States v. DeFries*, 129 F.3d 1293, 1313-15 (D.C. Cir. 1997) (holding that "proceeds" in RICO forfeiture statute means gross proceeds, and rejecting *United States v. Masters*, 924 F.2d 1362, 1369-70 (7th Cir. 1991) (holding that RICO forfeiture is limited to net profits)); *see also United States v. Peters*, 732 F.3d 93, 100-102 (2d Cir. 2013) (holding that "the term 'proceeds' is not limited to profits" and that forfeiting defendant's profits alone is not punishment because it merely returns the defendant to the economic position he occupied before he committed the offense); *United States v. Simmons*, 154 F.3d 765, 770 (8th Cir. 1998) (collecting cases and holding that "the better view is the one that defines proceeds as the gross receipts of the illegal activity;" forfeiture is intended to punish all those who receive income from illegal activity, not just those whose criminal activity turns a profit); *United States v. McHan*, 101 F.3d 1027, 1041-42 (4th Cir. 1996) (same); *United States v. Hurley*, 63 F.3d 1, 21-22 (1st Cir. 1995) (same).

Thus, the Defendant is subject to a forfeiture money judgment equal to the amount of proceeds traceable to the violation in Count Two of the Indictment – Interference with Interstate Commerce by Extortion, in violation of 18 U.S.C. § 1951(a) – to which he pled guilty.   *See, e.g.*,

*United States v. Jafari*, 85 F. Supp. 3d 679, 685 (W.D.N.Y. 2015) ("[I]f the Government proves the amount of the gross proceeds of the fraud, it is entitled to a money judgment in that amount") (internal quotations omitted).

As noted earlier, the Defendant acknowledged in his Statement of Offense that he personally handled or otherwise received $3,229,010.  *See* Evans Statement of Offense ¶¶ 14(d), (n), (u), (ff), (kk), (nn), (ss), and (tt) (ECF No. 74) (totaling $3,229,010).  Accordingly, this Court should order a forfeiture money judgment in that amount.[8]

### III.   THIS COURT SHOULD SENTENCE THE DEFENDANT TO 66 MONTHS' INCARCERATION

Pursuant to 18 U.S.C. § 3553(a)(1)-(2), in sentencing the Defendant, the Court must consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the need for the sentence to reflect the seriousness of the offense, to

---

[8] To the extent the Defendant suggests that the value of the items he has forfeited automatically should be credited towards restitution, that argument is untenable for both practical and legal reasons.  This Court must impose upon the Defendant two separate monetary obligations, forfeiture and restitution, because they are separate and distinct legal remedies that serve different purposes.  *See United States v. McGinty*, 610 F.3d 1242, 1247-48 (10th Cir. 2010); *see also United States v. Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007) (restitution focuses on the victim; forfeiture focuses on imposing punishment by forcing defendant to disgorge the proceeds of his criminal activity; both are mandatory); *United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009) (forfeiture and restitution are both mandatory and serve different purposes; one should not be offset against the other).  A court cannot order the government to use forfeited assets to pay restitution to victims named in a restitution order.  *See United States v. Alalade*, 204 F.3d 536, 540-41 (4th Cir. 2000) (holding that court lacks discretion under the MVRA to reduce restitution by an amount equal to the value of the property forfeited to the government).  In any event, the government has agreed to make a non-binding recommendation to the Money Laundering and Asset Recovery Section at the Department of Justice that any monies obtained from the defendant through forfeiture be distributed to the victims of the offense in accordance with any restitution order entered in this case.  *See* Evans Plea Agreement ¶ 12(a) (ECF No. 73).  Additionally, the government does agree that the amount of any forfeiture money judgment imposed may be reduced by the forfeiture of assets after ancillary proceedings are completed.

promote respect for the law, to provide for just punishment, to deter the Defendant and others from this type of criminal conduct, and to protect the public from further crimes of the Defendant. The facts of this case clearly reflect a serious harm created by the Defendant's actions and an unmistakable risk the Defendant poses to the community.

> **A.    The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

This fraud and extortion scheme would not have succeeded to the level that it did but for the Defendant. He weaponized his personality and inflicted psychological torment on Daniel Zancan. He called Zancan and convincingly passed himself off as a mobster while demanding money and punctuating his demands with questions like, "Do I need to tell you where your kids go to school? Do I need to tell you where you live?" A crime which involves a parent feeling like harm might come to their children is extremely serious. Moreover, the Defendant committed these acts for one reason: greed. He did not need Zancan to embezzle money so that he could put food on his family's table. He did it so he and his family could take luxury vacations, purchase expensive jewelry, and buy luxury cars. The nature and circumstances of his brazen conduct, which ruined lives, necessitates a sentence of 66 months' imprisonment.

> **B.    The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

This case warrants a significant sentence to promote deterrence. The Defendant, over the course of several months, extorted Zancan by conniving sinister ways to create the urgency and fear sufficient for Zancan to provide the Defendant and his family members with over $4 million in cash and gold. Such depraved conduct justifies the penalty the government is requesting in this case and warrants a significant sentence to deter this defendant and any other individual who

believes that conduct such as that involved in this case is acceptable or will go lightly punished. A sentence below 66 months, based on the conduct that the Defendant committed and the role that he played in the overall extortion, fraud, and money laundering scheme, would not provide the appropriate level of deterrence that his conduct warrants.

### C.    The Need to Protect the Public from Future Crimes of the Defendant

By the Defendant's own admission, he is "a scam artist."   His interactions with Zancan illustrate the lengths he will go to in order to cheat and steal. While the government is hopeful that the Defendant will leave prison committed not to victimize any more people, that aspirational thought is merely that: aspirational. A 66-month sentence, on the other hand, would ensure that the public is protected from being victimized by the Defendant, at least while he is incarcerated.

### D.    The History and Circumstances of the Defendant

To his credit, the Defendant undoubtedly has the care and support of his common-law wife and children, and he is a gregarious, likeable individual.   The FBI agents have consistently noted that he has been courteous and respectful during their interactions with him.   Unfortunately, by his own admission, he is a "scam artist."   There also is no doubt that he has not been fully forthcoming during his debriefings with the government.   In addition, there is a troubling sense that he and several of his family members have been defrauding unwitting victims for years and that their excessive greed, as evidenced by the conduct in this case, is what finally caught up to them.

Considering the Defendant's actions in this case, not only his criminal behavior, but also his meetings with law enforcement, a sentence of 66 months' imprisonment is appropriate.   Such a sentence fully considers his willingness to come partially clean to the government about his

behavior and about some—but not all—of the behavior of his family members.   Such a sentence would send a clear message to the Defendant and others, including his family members, that he received a significant benefit (1) by providing information to the government and (2) by taking affirmative actions to forfeit property in an attempt to make the victim partially whole.   A 66-month sentence is well below the 97 to 121 months that he would have faced had the Government's plea offer been conditioned on him pleading guilty to Money Laundering Conspiracy, a charge which his Statement of Offense clearly supports. In sum, a 66-month sentence is appropriate in this case.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence the Defendant to 66 months of incarceration followed by three years of supervised release, order restitution in the amount of $4,217,542.86, and impose a forfeiture money judgment in the amount of $3,229,010.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
for the District of Columbia

By:   _____/s/_____

DAVID B. KENT, D.C. Bar No. 482850
KONDI KLEINMAN, CA Bar. No. 241277
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 272-7762 (Kent)
(202) 252-6887 (Kleinman)
David.Kent@usdoj.gov
Kondi.Kleinman2@usdoj.gov